**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Tonya Merlitti                                )
4820 Gate Post Lane                     )
Kent, OH, 44240,                          )
                                                     )
Plaintiff,                                       )
                                                     )
v.                                                  )
                                                     )
University of Akron                       )
302 Buchtel Commons                   )
Akron, OH, 44325,                        )
                                                     )
and                                              )
                                                     )
Greenleaf Family Center              )
580 Grant Street                           )
Akron, OH, 44311,                        )
                                                     )
and                                              )
                                                     )
Angela M. Richmond-Rossiter, LPCC  )
580 Grant Street                           )
Akron, OH, 44311,                        )
                                                     )
and                                              )
                                                     )
Alise G. Bartley, Ph.D.                  )
The Relationship Center              )
7023 Mears Gate Drive, NW, Suite A  )
North Canton, OH, 44720,            )
                                                     )
and                                              )
                                                     )
John L. Balash, III, LPCC              )
246 Northland Drive, Suite 200A  )
Medina, OH, 44256,                      )
                                                     )
and                                              )
                                                     )

1

Karin B. Jordan, Ph.D.                  )
The University of Akron                  )
Counseling Department                    )
Akron, OH, 44325-5007,                   )
                                         )
and                                      )
                                         )
Family Pride of Northeast Ohio, Inc.     )
695 South Street, #6                     )
Chardon, OH, 44024,                      )
                                         )
and                                      )
                                         )
Angela L. Daugherty, LISW                )
Family Pride of Northeast Ohio, Inc.     )
695 South Street, #6                     )
Chardon, OH, 44024,                      )
                                         )
and                                      )
                                         )
Margaret J. Spellman, LPCC               )
695 South Street, Suite 6                )
Chardon, OH, 44024,                      )
                                         )
and                                      )
                                         )
Jennifer S. Emch, M.Ed.                  )
695 South Street, #6                     )
Chardon, OH, 44024,                      )
                                         )
and                                      )
                                         )
Rikki A. Patton, Ph.D.                   )
The University of Akron                  )
Counseling Department                    )
Akron, OH, 44325-4201,                   )
                                         )
and                                      )
                                         )
Rebecca A. Boyle, Ph.D.                  )
The University of Akron                  )
Counseling Department                    )
Akron, OH, 44325-5007,                   )
                                         )
and                                      )
                                         )

Heather Katafiasz, Ph.D.                    )
The University of Akron                      )
Counseling Department                        )
Akron, OH, 44325-5007,                       )
                                             )
and                                          )
                                             )
David H. Tefteller, Ph.D.                    )
The University of Akron                      )
Counseling Department                        )
Akron, OH, 44325-5007,                       )
                                             )
and                                          )
                                             )
Rex D. Ramsier, Ph.D.                        )
The University of Akron                      )
Office of Academic Affairs                   )
Akron, OH, 44325-4703,                       )
                                             )
and                                          )
                                             )
Mark G. Stasitis                             )
The University of Akron                      )
Office of the Vice President and             )
General Counsel                              )
Akron, OH, 44325-4706,                       )
                                             )
and                                          )
                                             )
Matthew J. Wilson                            )
The University of Akron                      )
Office of the President                      )
Akron, OH, 44325-4702,                       )
                                             )
and                                          )
                                             )
David Gordon, M.D.                           )
University of Michigan Pathology             )
University Hospital Floor 2                   )
1500 East Medical Center Drive               )
SPC 5054                                     )
Ann Arbor, MI, 48109,                        )
                                             )

```
and                              )
                                 )
Names Unknown                    )
(John Does 1-100),               )
                                 )
Defendants.                      )
```

---

## COMPLAINT

---

### JURY DEMAND ENDORSED HEREON

---

Now comes plaintiff Tonya Merlitti, by and through counsel, and hereby alleges the following claims jointly and severally against each of the above-listed defendants in the above-captioned case:

### INTRODUCTORY STATEMENT

Tonya Merlitti was a graduate student at the University of Akron.  Things were going very well for her.   She was an excellent student, earning a 3.685 grade point average.  She was a few weeks away from graduating with a Master's Degree in Marriage and Family Therapy.

At this point in her studies, her classroom work was finished and she was completing a clinical practicum.  She received excellent feedback from her practicum supervisors.  Her practicum site was so favorably impressed with her, that it offered her a job for after graduation.

One day, Ms. Merlitti's practicum supervisor ordered her to meet at a local McDonald's restaurant to discuss practicum matters.  Ms. Merlitti told her professor about the McDonald's meeting.  The professor accused Ms. Merlitti of unethical conduct and ordered her not to return to class.  Shortly after, the university expelled Ms. Merlitti on the grounds that she violated the ethical rules of the marriage and family therapy profession.

A few months later, Ms. Merlitti was completely exonerated of any unethical conduct.  So, she applied to the university for reinstatement.  The university refused to reinstate her.  This time, however, the university changed its story, claiming that Ms. Merlitti had substandard diagnostic skills.  This, despite the fact that Ms. Merlitti earned a B in the diagnosis class and there was never any allegation or evidence of substandard diagnostic skills.

Along the way, the university roundly violated Ms. Merlitti's procedural and substantive due process rights and, consequently, is liable to her for the causes of action and damages set forth below.

## PARTIES

1. Plaintiff Tonya Merlitti is an Ohio resident.  She was a student in the Master's Program in Marriage and Family Counseling/Therapy in the University of Akron's College of Health Professions, School of Counseling ("Program") from January 2012 until January 2016.

2. Defendant University of Akron is a public university located in Akron, Ohio.

3. Defendant Greenleaf Family Center is an Ohio, non-profit corporation located in Akron, Ohio that provides mental health services, including marriage and family therapy.

4. Defendant Angela M. Richmond-Rossiter, LPCC is an Ohio resident.  During the relevant time period, she was Ms. Merlitti's practicum supervisor at Greenleaf Family Center and an agent of the University of Akron.

5. Defendant Alise G. Bartley, Ph.D. is an Ohio resident.  At all relevant times, she was a professor in the University of Akron's Counseling Department, Ms. Merlitti's practicum class supervisor for the Greenleaf Family Center practicum, and an agent of the University of Akron.

6. Defendant John L. Balash, III, LPCC is an Ohio resident.  During the relevant time period, he was Ms. Merlitti's practicum supervisor at Greenleaf Family Center, the supervisor Ms. Merlitti's direct supervisor at Greenleaf Family Center, and/or an agent of the University of Akron.

7. Defendant Karin B. Jordan, Ph.D. is an Ohio resident.  At all relevant times, she was the Chair of the University of Akron's Counseling Department, Ms. Merlitti's assigned, direct student advisor, a University of Akron faculty member, and/or an agent of the University of Akron.

8. Defendant Family Pride of Northeast Ohio, Inc. is an Ohio, non-profit corporation located in Chardon, Ohio that provides mental health services, including marriage and family therapy.

9. Defendant Angela L. Daugherty, LISW is an Ohio resident.  During the relevant time period, she was Ms. Merlitti's practicum supervisor at Family Pride, the supervisor Ms. Merlitti's direct supervisor at Family Pride, and/or an agent of the University of Akron.

5

10.  Defendant Margaret J. Spellman (née Gurry), LPCC is an Ohio resident.  During the relevant time period, she was Ms. Merlitti's practicum supervisor at Family Pride and/or an agent of the University of Akron.

11.  Defendant Jennifer S. Emch, M.Ed. is an Ohio resident.  During the relevant time period, she was Ms. Merlitti's clinical supervisor at Family Pride and/or an agent of the University of Akron.

12.  Defendant Rikki A. Patton, Ph.D. is an Ohio resident.  At all relevant times, she was a professor in the University of Akron's Counseling Department, Ms. Merlitti's practicum class supervisor for the Family Pride practicum, and an agent of the University of Akron.

13.  Defendant Rebecca A. Boyle, Ph.D. is an Ohio resident.  At all relevant times, she was a lecturer in the University of Akron's Counseling Department, a University of Akron faculty member, and/or an agent of the University of Akron.

14.  Defendant Heather Katafiasz, Ph.D. is an Ohio resident.  At all relevant times, she was a professor in the University of Akron's Counseling Department, a University of Akron faculty member, and/or an agent of the University of Akron.

15.  Defendant David H. Tefteller, Ph.D. is an Ohio resident.  At all relevant times, he was an instructor in the University of Akron's Counseling Department, a University of Akron faculty member, and/or an agent of the University of Akron.

16.  Defendant Rex D. Ramsier, Ph.D. is an Ohio resident.  At all relevant times, he was the University of Akron's Senior Vice President and Provost and an agent of the University of Akron.

17.  Defendant Mark G. Stasitis is an Ohio resident.  At all relevant times, he was the University of Akron's Assistant General Counsel and an agent of the University of Akron.

18.  Defendant Matthew J. Wilson is an Ohio resident.  At all relevant times, he was the President of the University of Akron and an agent of the University of Akron.

19.  Defendant David Gordon, M.D. is currently a Michigan resident.  At all relevant times, he was the Dean of the University of Akron's College of Health Professions, a University of Akron faculty member, and/or an agent of the University of Akron.

20.  Defendants John Does 1-100 are defendants whose names are currently unknown.  The Plaintiff could not discover their true names.  Plaintiff is informed and believes, and upon that basis alleges, that each such John Doe defendant, whose names are currently unknown, is responsible in substantial part for the Plaintiff's

injuries.  The Plaintiff shall allege the names of John Does 1-100 if and when they become known to the Plaintiff.

## JURISDICTION

21.   Plaintiff incorporates all preceding paragraphs of this Complaint herein.

22.   All of the relevant facts that form the basis of this Complaint occurred in Summit County, Ohio.

23.   The claims alleged in this complaint (i) arise under the Constitution or laws of the United States, and/or (ii) are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

24.   This court has jurisdiction over this case pursuant to 28 U.S.C. §1331 (federal question) and 28 U.S.C. §1367 (supplemental jurisdiction).

## FACTS

25.   Plaintiff incorporates all preceding paragraphs of this Complaint herein.

### Greenleaf Practicum

26.   From January 2015 until April 2015, and pursuant to the Program's requirements, Ms. Merlitti was enrolled in a practicum at Greenleaf Family Center, 580 Grant Street, Akron, Ohio, 44311.

27.   During the relevant time, the University of Akron and Greenleaf Family Center had an arrangement whereby Program students had direct client contact under the supervision of licensed therapists and counselors who were Greenleaf employees.

28.   During her practicum at Greenleaf Family Center, Ms. Merlitti diagnosed a client with an adjustment disorder.

29.   Ms. Richmond-Rossiter (Ms. Merlitti's practicum supervisor at Greenleaf) said to Ms. Merlitti: "We do not diagnose adjustment disorders because Medicaid does not pay for them."

30.   Soon afterward, Ms. Merlitti reported Ms. Richmond-Rossiter's statement to her instructor, Dr. Bartley.  Dr. Bartley said to Ms. Merlitti: "John would never do that!"  Dr. Bartley was referring to Mr. Balash.

31.   On or about April 1, 2015, Mr. Balash (the then-director of Greenleaf Family Center) told Ms. Merlitti that, due to alleged complications with diagnosing:

"Today will be your last day at Greenleaf and you're welcome to come back to complete your internship after you've taken more diagnosing courses."

32.    On or about April 1, 2015, Mr. Balash instructed Ms. Merlitti to contact all clients who Ms. Merlitti was scheduled to see that day and to transfer all of these clients to another therapist.

33.    On or about April 8, 2015, Ms. Merlitti had a meeting with Dr. Jordan to discuss the termination of Ms. Merlitti's Greenleaf practicum.  During this meeting, Dr. Jordan said to Ms. Merlitti: "You do not need to take another diagnosis course.  Sometimes, internships just are not a good fit.  Do not be concerned.  This was rare.  Seek out another internship site."

34.    Dr. Jordan's contemporaneous notes on this incident falsely state: "[Ms. Merlitti] also reported that she was not taught to give 'adjustment disorder' diagnosis such as she had been required to do at her site [(*i.e.*, Greenleaf Family Center)]." Jordan Notes (Exhibit A).

35.    During her practicum at Greenleaf Family Center, Ms. Merlitti's supervisor prepared a document entitled "Internship Clinical Evaluation."  There are fifteen instances in which Ms. Merlitti's scores were altered from higher numbers to lower numbers after she signed the document.  *See* Internship Clinical Evaluation (Exhibit B).  Whoever altered this document is necessarily a Greenleaf Family Center employee, an agent of the University of Akron, or both.

**Family Pride Practicum**

36.    Beginning in June 2015, and pursuant to the Program's requirements, Ms. Merlitti was enrolled in a practicum at Family Pride of Northeast Ohio, 695 South Street, Suite 6, Chardon, Ohio, 44024.

37.    During the relevant time, the University of Akron and Family Pride had an arrangement whereby Program students had direct client contact under the supervision of licensed marriage and family therapists who were Family Pride employees.

38.    During Ms. Merlitti's tenure at Family Pride, Ms. Emch (one of Ms. Merlitti's supervisors at Family Pride) made the following comments about Ms. Merlitti's client contacts:

(i)     "You are the secret weapon!"

(ii)    "The clinical summary looks fine and the [diagnosis] looks correct too!"

(iii)   "You are a saint and I thank you!"
Text messages from Ms. Emch to Ms. Merlitti (Exhibit C).

8

39.     Family Pride was so favorably impressed with Ms. Merlitti's practicum work that Ms. Daugherty (Family Pride's executive director), on behalf of Family Pride, offered Ms. Merlitti a full-time, marriage and family therapist job on or about October 28, 2015.

40.     Family Pride provided Ms. Merlitti with a written job offer that addressed "job breakdown," "job code," "productivity," "documentation/travel," "paid vacation," "holiday pay," "Family Pride Learning Center," "staff meeting requirements," "mileage," and "health benefits" terms.  *See* Family Pride job offer to Ms. Merlitti (Exhibit D).

41.     Family Pride and Ms. Merlitti agreed upon salary terms and a start date. *See* Ms. Merlitti's contemporaneous notes showing a planned beginning employment date at Family Pride of January 4, 2016 (Exhibit E); Ms. Merlitti's contemporaneous notes memorializing her conversation with Family Pride regarding employment (Exhibit F).

**The McDonald's Meeting**

42.     On or about October 19–23, 2015, Ms. Spellman (Ms. Merlitti's practicum supervisor at Family Pride) ordered Ms. Merlitti to meet with her at a local McDonald's restaurant to discuss practicum matters.

43.     On or about November 5, 2015, Ms. Merlitti reported this McDonald's meeting to Dr. Patton, the University of Akron professor who oversaw Ms. Merlitti's practicum at Family Pride.

44.     On or about November 5, 2015, Dr. Patton told Ms. Merlitti that this meeting at McDonald's was "unethical."

45.     On or about November 5, 2015, Dr. Patton ordered Ms. Merlitti not to return to class.

46.     On or about November 6, 2015, because of the psychological trauma resulting from the false accusation of unethical behavior and being ordered not to return to class, Ms. Merlitti suffered an acute psychotic episode marked by extreme paranoia.

47.     Due to the psychological trauma resulting from the false accusation of unethical behavior and being ordered not to return to class, Ms. Merlitti was hospitalized as an in-patient for psychiatric treatment until November 9, 2015.

48.     Ms. Merlitti continues to receive mental health services for the psychological trauma that she suffered resulting from the false accusation of unethical behavior and being ordered not to return to class.

49.  On or about November 9–13, 2015, Program faculty members Drs. Boyle, Jordan, and Patton met privately to discuss the McDonald's meeting.

50.  On or about November 9, 2015, Dr. Patton met with Ms. Merlitti's Family Pride supervisors, including Ms. Spellman.

51.  On or about November 16, 2015, Drs. Boyle, Patton, and Jordan met to discuss Dr. Patton's meeting with Ms. Spellman.

52.  On or about November 18, 2015, Ms. Emch said to Ms. Merlitti: "You are a liability."

53.  On or about November 18, 2015, Family Pride terminated Ms. Merlitti's practicum.

54.  On or about November 18, 2015, Family Pride rescinded its full-time, marriage and family therapist job from Ms. Merlitti.

55.  On or about November 20, 2015, Ms. Merlitti met with Program faculty members Drs. Jordan and Patton.  Drs. Jordan and Patton falsely accused Ms. Merlitti of "breaking confidentiality" with twenty-one Family Pride clients.  Dr. Jordan told Mr. Merlitti: "We have a lot of things to go over.  We are still gathering information."

56.  On December 8, 2015, the University of Akron changed Ms. Merlitti's grade for the Family Pride practicum to "no credit."  This grade change prevented Ms. Merlitti from graduating from the Program in December 2015.

**The December 18, 2015 hearing**

57.  On December 18, 2015, Program faculty members Drs. Boyle, Jordan, Katafiasz, Patton, Tefteller held a hearing to adjudicate allegations against Ms. Merlitti.

58.  The Program faculty members did not present Ms. Merlitti with a list of allegations prior to the December 18, 2015 hearing.

59.  Ms. Merlitti did not receive a list of these allegations until February 23, 2017.

60.  The Program leveled twenty-three allegations against Ms. Merlitti at the December 8, 2015 hearing.  *See* Report for Student Hearing (Exhibit G).

61.  Of the twenty-three allegations, only seven are uniquely substantive.  The other sixteen are reiterations of the seven substantive allegations in different combinations and permutations.

10

62.     Allegations #1 through #5 are based upon the American Association for Marriage and Family Therapy Code of Ethics.

63.     The American Association for Marriage and Family Therapy has no record of Ms. Merlitti violating its Code of Ethics.  *See* AAMFT Letter (Exhibit H).

64.     Allegation #1 states: "Tonya reported participating in supervision at McDonalds [sic], which was a potential ethical violation on the part of her supervisor, without reporting."

65.     As the Ohio Counselor, Social Worker, and Marriage and Family Therapist Board ("Board")[1] later determined, Ms. Merlitti's meeting at McDonald's was not an ethical violation.

66.     Ms. Merlitti reported the McDonald's meeting to Dr. Patton on November 5, 2015, which was the very next required, biweekly meeting to discuss practicum issues with Program faculty.

67.     Allegation #1 is not true.

68.     Allegation #2 states: "Tonya reported contacting clients post-dismissal from Greenleaf."

69.     At approximately 1:00 p.m. on April 1, 2015, Ms. Merlitti's practicum at Greenleaf Family Center told her that her practicum would be terminated effective at the end of that workday.  She was scheduled to see clients during the remainder of that day.  That same day, and at Mr. Balash's direction, she merely contacted these remaining clients to inform them that another therapist would be taking over their care.  This did not violate any ethical rules.  In fact, if Ms. Merlitti had failed to so notify her scheduled clients, she would be subject to professional discipline for failing to properly terminate services. *See* Ohio Administrative Code 4757-5-02(E).

70.     Allegation #2 is not true.

71.     Allegation #3 states: "Tonya turned in form to Drs. Jordan and Patton that included client's [sic] identifying information."

72.     All Program students, including Ms. Merlitti, were required to share information from their practicum experiences—including confidential, identifying information—with Program faculty and students as a required part of the practicum.  Indeed, the Program required biweekly meetings precisely for this purpose.

---

[1] The Board is the state administrative agency responsible for regulating, *inter alia*, marriage and family therapists in Ohio.

73.     Allegation #3 fails to allege any prohibited conduct.

74.     Allegation #4 states: "As reported by Maggie Gurry, Tonya reported completing group hours at Mature Services without approval from her agency.  Tonya did not seek out university approval.  Tonya reported to Drs. Jordan and Patton that she removed those hours from her logs after the problem was resolved."

75.     This allegation states that Ms. Merlitti resolved the problem.   Therefore, Allegation #4 alleges no violation.

76.     Allegation #5 states:

As reported by Maggie Gurry, Maggie rejected 90% of Tonya's paperwork at the end of October due to noncompliance and too long to complete.

As reported by both Maggie Gurry and Tonya, Tonya turned in paperwork late and did not complete assessments in a timely manner.

As reported by Maggie Gurry, Tonya demonstrated "rigid thinking" regarding assessment and diagnosis and was not open to feedback to improve this lack of competence.

As reported by Maggie Gurry, Tonya reported completing group hours at Mature Services without approval from her agency.  Tonya did not seek out university approval.  Tonya reported to Drs. Jordan and Patton that she removed those hours from her logs.

As reported by Maggie Gurry, Tonya showed up late to meet with clients on multiple occasions.

Tonya reported contacting clients post-dismissal from Greenleaf

77.     Allegation #5 is not true.

78.     Allegations #6 through #16 are based upon the American Counseling Association Code of Ethics.

79.     The American Counseling Association has no record of Ms. Merlitti violating its Code of Ethics.  *See* ACA Email (Exhibit I).

80.     Allegation #6 states: "As reported by Maggie Gurry, Maggie rejected 90% of Tonya's paperwork at the end of October due to non compliance and taking too long to complete.  As reported by both Maggie Gurry and Tonya, Tonya turned in paperwork late and did not complete assessments in a timely manner."

81.     Allegation #6 is merely a restatement of previous allegations and is not true.

82.     Allegation #7 states: "Tonya reported participating on [sic] supervision at McDonalds [sic].  Tonya turned in forms to Drs. Jordan and Patton that included client's [sic] identifying information on it."

83.     Allegation #7 is merely a restatement of previous allegations and is not true.

84.     Allegation #8 states: "Tonya turned in form to Drs. Jordan and Patton that included client's [sic] identifying information."

85.     Allegation #8 is merely a restatement of previous allegations and is not true.

86.     Allegation #9 states: "Tonya reported participating in supervision at McDonalds [sic]."

87.     Allegation #9 is merely a restatement of previous allegations and is not true.

88.     Allegation #10 states: "Tonya reported participating in supervision at McDonalds [sic].  Tonya turned in form to Drs. Jordan and Patton that included client's identifying information."

89.     Allegation #10 is merely a restatement of previous allegations and is not true.

90.     Allegation #11 states: "As reported by Maggie Gurry, Maggie rejected 90% of Tonya's paperwork at the end of October due to noncompliance and taking too long to complete.  As reported by both Maggie Gurry and Tonya, Tonya turned in paperwork late and did not complete assessments in a timely manner."

91.     Allegation #11 is merely a restatement of previous allegations and is not true.

92.     Allegation #12 states: "Tonya turned in form to Drs. Jordan and Patton that included client's [sic] identifying information."

93.     Allegation #12 is merely a restatement of previous allegations and is not true.

94.     Allegation #13 states: "As reported by Maggie Gurry, Tonya demonstrated 'rigid thinking' regarding assessment and diagnosis and was not open to feedback to improve this lack of competence."

95.     Allegation #13 is merely a restatement of previous allegations and is not true.

96.     Allegation #14 states: "As reported by Maggie Gurry, Tonya demonstrated 'rigid thinking' regarding assessment and diagnosis and was not open to feedback to improve this lack of competence."

97.    Allegation #14 is merely a restatement of previous allegations and is not true.

98.    Allegation #15 states: "Tonya reported participating on supervision at McDonalds [sic].  As reported by Maggie Gurry, Tonya demonstrated 'rigid thinking' regarding assessment and diagnosis and was not open to feedback to improve this lack of competence."

99.    Allegation #15 is merely a restatement of previous allegations and is not true.

100.   Allegation #16 states:

Tonya reported participating in supervision at McDonalds [sic], which was a potential ethical violation on the part of her supervisor, without reporting.

Tonya turned in form to Drs. Jordan and Patton that included client's [sic] identifying information.

As reported by Maggie Gurry, Maggie rejected 90% of Tonya's paperwork at the end of October due to noncompliance and too long to complete.

As reported by both Maggie Gurry and Tonya, Tonya turned in paperwork late and did not complete assessments in a timely manner.

As reported by Maggie Gurry, Tonya demonstrated "rigid thinking" regarding assessment and diagnosis and was not open to feedback to improve this lack of competence.

As reported by Maggie Gurry, Tonya reported completing group hours at Maturity Services without approval from her agency.  Tonya did not seek out university approval.  Tonya reported to Drs. Jordan and Patton that she removed those hours from her logs.

As reported by Maggie Gurry, Tonya showed up late to meet with clients on multiple occasions.

Tonya reported contacting clients post-dismissal from Greenleaf.

101.   Allegation #16 is merely a restatement of previous allegations and is not true.

102.   Allegations #17 through #23 are based upon Ohio Administrative Code 4757-5.

103.   Allegation #17 states: "As reported by Maggie Gurry, Tonya demonstrated 'rigid thinking' regarding assessment and diagnosis and was not open to feedback to

improve this lack of competence.  As reported by Maggie Gurry, Tonya showed up late to meet with clients on multiple occasions."

104.   The Board investigated Allegation #17 and concluded that there was no violation of Ohio Administrative Code 4757-5.  Therefore, Allegation #17 is baseless and untrue as a matter of law.

105.   Allegation #18 states: "As reported by Maggie Gurry, Tonya reported completing group hours at Maturity Services without approval from her agency.  Tonya did not seek out university approval.  Tonya reported to Drs. Jordan and Patton that she removed those hours from her logs."

106.   The Board investigated Allegation #18 and concluded that there was no violation of Ohio Administrative Code 4757-5.  Therefore, Allegation #18 is baseless and untrue as a matter of law.

107.   Allegation #19 states: "As reported by Maggie Gurry, Tonya arrived late/left early from supervision on multiple occasions."

108.   The Board investigated Allegation #19 and concluded that there was no violation of Ohio Administrative Code 4757-5.  Therefore, Allegation #19 is baseless and untrue as a matter of law.

109.   Allegation #20 states: "Tonya reported participating in supervision at McDonalds [sic], which was a potential ethical violation on the part of her supervisor, without reporting.  Tonya turned in form to Drs. Jordan and Patton that included client's [sic] identifying information."

110.   The Board investigated Allegation #20 and concluded that there was no violation of Ohio Administrative Code 4757-5.  Therefore, Allegation #20 is baseless and untrue as a matter of law.

111.   Allegation #21 states: "Tonya reported contacting clients post-dismissal from Greenleaf."

112.   The Board investigated Allegation #21 and concluded that there was no violation of Ohio Administrative Code 4757-5.  Therefore, Allegation #21 is baseless and untrue as a matter of law.

113.   Allegation #22 states: "As reported by Maggie Gurry, Maggie rejected 90% of Tonya's paperwork at the end of October due to noncompliance and too long to complete. As reported by both Maggie Gurry and Tonya, Tonya turned in paperwork late and did not complete assessments in a timely manner."

114.   The Board investigated Allegation #22 and concluded that there was no violation of Ohio Administrative Code 4757-5.  Therefore, Allegation #22 is baseless and untrue as a matter of law.

115.   Allegation #23 states: "Tonya reported participating in supervision at McDonalds [sic], which was a potential ethical violation on the part of her supervisor, without reporting."

116.   The Board investigated Allegation #23 and concluded that there was no violation of Ohio Administrative Code 4757-5.  Therefore, Allegation #23 is baseless and untrue as a matter of law.

117.   On or about January 7, 2016, the University of Akron dismissed Ms. Merlitti from the Program on the false grounds that she violated the ethics of the marriage and family therapy profession.

## The Board Investigation

118.   On or about December 10, 2015, Dr. Patton filed a complaint against Ms. Merlitti with the Board alleging that she violated the statutes and rules (including ethics rules) governing the marriage and family therapy profession in Ohio.

119.   In May 2016, a Board investigator interviewed Ms. Merlitti about, *inter alia*, allegations of ethical misconduct, including the McDonald's meeting, allegedly showing up late for practicum, alleged paperwork violations, and all of the other allegations leveled against Ms. Merlitti at the December 18, 2015 hearing.

120.   On or about July 21, 2016, the Board closed its investigation against Ms. Merlitti because it found no violations or wrongdoing.  *See* Board Letter (Exhibit J)

## Ms. Merlitti's attempts to gain reinstatement to the Program

121.   On or about January 27, 2017, and after being completely exonerated of any ethical violations, Ms. Merlitti applied for reinstatement to the Program.

122.   On or about April 10, 2017, the Program denied Ms. Merlitti's application for reinstatement.

123.   On or about April 14, 2017, Ms. Merlitti timely filed an appeal of the reinstatement denial with the University of Akron's Graduate School Student Conduct Office.

124.   To date, Ms. Merlitti has not received a formal response to her appeal of the reinstatement denial that she filed with the University of Akron's Graduate School Student Conduct Office.

125.  On or about April 17, 2017, Dr. Ramsier, in his capacity as the University of
      Akron's Senior Vice President and Provost, wrote a letter to Ms. Merlitti and
      others which provides, in relevant part:

      This letter serves as a response to your request for a written statement
      from the Marriage and Family Counseling/Therapy Master's program
      outlining the reasons for denying your readmission.  Your application was
      denied for the following reasons: 1) you did not provide sufficient
      evidence of understanding professional ethics, and 2) your responses
      during the interview did not demonstrate critical thinking surrounding
      diagnosis or supervision.

      Ramsier Letter (Exhibit K).

126.  Contrary to Dr. Ramsier's letter, the Board completely exonerated Ms. Merlitti of
      violating any ethical laws or rules.

127.  Contrary to Dr. Ramsier's letter, Ms. Merlitti was never accused of, or
      adjudicated as having, deficient critical thinking surrounding diagnosis or
      supervision.

128.  In the Spring 2014 term, Ms. Merlitti took a course called "DSM."  "DSM" refers
      to the Diagnostic and Statistical Manual of Mental Disorders.  Thus, the DSM
      course is a course on diagnosis.  Ms. Merlitti received a grade of "B" in this
      course.  *See* Unofficial Academic Record (Exhibit L).

129.  Ms. Merlitti's grade point average for her coursework in the Program is 3.685 on
      a 4.000 scale.  *See id.*

130.  On or about May 19, 2017, Ms. Merlitti, through counsel, requested from
      President Wilson a Presidential Review of her dismissal pursuant to Code of
      Student Conduct of the University of Akron 3359-41-01(I)(2).

131.  On or about June 16, 2017, Mr. Stasitis wrote a letter which provides, in relevant
      part: "In [Ms. Merlitti]'s case, she was dismissed from an academic program as a
      result of concerns dealing with her ethical behavior . . . The basis for the prior
      dismissal was a result of multiple ethical violations."  Stasitis Letter #1 p. 1-2
      (Exhibit M).

132.  On or about July 13, 2017, Dr. Ramsier, in his capacity as the University of
      Akron's Senior Vice President and Provost, wrote an email to Ms. Merlitti which
      provides, in relevant part: "Please cease communications on this matter with other
      offices at The University of Akron.  Our employees have the needs of current
      students to attend to."  Ramsier Email (Exhibit N).

17

133.  On or about July 16, 2017, the University of Akron and President Wilson denied Ms. Merlitti's request for a Presidential Review of her dismissal and reaffirmed her dismissal.

134.  On or about October 9, 2017, Ms. Merlitti, through counsel, requested reinstatement into the Program.

135.  On or about November 17, 2017, the University of Akron denied Ms. Merlitti's request for reinstatement into the Program.

136.  On or about November 17, 2017, Mr. Stasitis wrote a letter which provides, in relevant part: "Ms. Merlitti signed a Memorandum of Agreement with each of her internship locations attesting to have read and understood the ACA and AAMFT ethical standards and that she would abide by those standards. . . . Ms. Merlitti breached the agreements she signed with each site."  Stasitis Letter #2 p. 1-2 (Exhibit O).

**Code of Student Conduct of the University of Akron**

137.  As a matter of law, Ms. Merlitti and the University of Akron had a contractual relationship.  The terms of this contract include, *inter alia*, the Code of Student Conduct of the University of Akron ("Code") (Exhibit P).  *See Behrend v. State*, 55 Ohio App.2d 135, 139, 140, 379 N.E.2d 617 (10th Dist. 1977); *Al Dabagh v. Case Western Reserve Univ.*, 777 F.3d 355, 359 (6th Cir. 2015).

138.  During the relevant time period, Ms. Merlitti was a "student" as defined by Code 3359-41-01(B)(11).

139.  Code 3359-41-01(C)(1)(a)-(d) addresses "Jurisdiction" and provides, in relevant part:

The university of Akron code of student conduct applies to the conduct of all students . . . that occurs on . . . non-university premises, where the conduct away from university premises is deemed by the university to affect the university or its students and university employees, including but not limited to:

(a) Any professional practice assignment;

(b) Any activity performed to satisfy academic course requirements, such as internships, field trips, or student teaching;

(c) Any activity supporting pursuit of a degree . . . ;

(d) Any activity sponsored, conducted, or authorized by the university . . . [.]

18

140.   Pursuant to Code 3359-41-01(C)(1)(a)-(d), Ms. Merlitti's practicum at Greenleaf Family Center is within the University of Akron's jurisdiction.

141.   Pursuant to Code 3359-41-01(C)(1)(a)-(d), Ms. Merlitti's practicum at Family Pride is within the University of Akron's jurisdiction.

142.   Code 3359-41-01(D)(1)(a) defines "student misconduct" and provides, in relevant part:

The university of Akron defines "student misconduct" as behavior that violates university policies, rules and regulations. ***Any student . . . alleged to have committed or to have attempted to commit the following misconduct is subject to the disciplinary process outlined in this rule***.

(1) Academic misconduct is any activity that compromises the academic integrity of the student and university, and undermines the educational process. (emphasis added)

143.   With respect to healthcare professional education (*e.g.*, marriage and family counseling education), an alleged ethical violation is an academic misconduct allegation as a matter of law.  *See Al Dabagh*, *supra*, at 357-360.

144.   The University of Akron accused Ms. Merlitti of academic misconduct (*i.e.*, allegedly violating the ethics of the marriage and family therapy profession).

145.   The University of Akron was required to adjudicate the allegations against Ms. Merlitti pursuant to the procedures provided in the Code.

146.   Code 3359-41-01(A)(3) provides, in relevant part: "Although the university of Akron's student disciplinary process is not designed to function as a court of law, there are policies and procedures in place to ensure that each student is treated in a fair and equitable manner."

147.   The Program failed to treat Ms. Merlitti in a "fair and equitable manner."

148.   Code 3359-41-01(E)(1) provides, in relevant part: "It is the intent of this provision that the department of student conduct and community standards shall be the exclusive administrative unit that has authority to investigate reports of misconduct as defined in this rule and to implement the procedures and sanctions as provided in this rule."

149.   The Program independently investigated, convened a hearing, and punished Ms. Merlitti.  The Program was not authorized to do so pursuant to Code 3359-41-01(E)(1).

19

150.    Code 3359-41-01(E)(1) provides, in relevant part:
         While other units and organizations such as residence halls, athletic teams
         and professional schools may have separate rules and administer separate
         penalties or sanctions, whether by contract or otherwise, that may apply to
         certain categories of students, ***the commission of misconduct as defined
         in this rule shall also be reported to the department of student conduct
         and community standards*** for action as appropriate under this rule.
         (emphasis added)

151.    The Program failed to report Ms. Merlitti's alleged misconduct to the department
         of student conduct and community standards.

152.    Code 3359-41-01(E)(2)(a) provides, in relevant part: "The department of student
         conduct and community standards, generally within five business days of receipt
         of a disciplinary referral, will send written notice to any student . . . identified as
         allegedly being in violation of university rules."

153.    The Program failed to provide Ms. Merlitti with timely, written notice of the
         alleged misconduct.

154.    Code 3359-41-01(E)(2)(b) provides, in relevant part:

         The student . . . shall be required to appear before an officer of the
         department of student conduct and community standards no more than five
         business days following receipt of notice, unless otherwise determined by
         the department of student conduct and community standards. Upon his or
         her appearance in the department of student conduct and community
         standards, the student . . . shall be informed of the initial report that alleges
         violations of university rules and regulations. All available materials
         related to the alleged violation of university rules shall be made available
         to the student or authorized representative.

155.    The Program failed to follow the above-listed requirements of Code 3359-41-
         01(E)(2)(b).

156.    Code 3359-41-01(E)(2)(b)(i)-(iii) provides, in relevant part:

         The student . . . shall be requested to make a statement concerning the
         reported violation, but prior to this request the student shall be informed
         that:

         (i) S/He is not required to make a statement . . . ; and

         (ii) Any statement s/he may wish to make may later be used in disciplinary
         proceedings, and

(iii) S/He has the right to have an advisor present. The role of an advisor is explained in paragraph (F)(2)(g) of this rule.

157. The Program failed to follow the above-listed requirements of Code 3359-41-01(E)(2)(b)(i)-(iii).

158. Code 3359-41-01(E)(2)(c) provides:

Investigation(s) generally will be completed within fifteen business days of the initial meeting. If additional time is needed to gather more information, student conduct and community standards shall make a request to the vice president for student affairs or his or her designee for a time extension(s) if the vice president determines that the circumstances warrant an extension.

159. The Program investigated the allegations against Ms. Merlitti for at least forty-three days (November 5, 2015 to December 18, 2015) in violation of Code 3359-41-01(E)(2)(c).

160. Neither the Program nor student conduct and community standards requested a time extension for the investigation from the vice president for student affairs or his designee as required by Code 3359-41-01(E)(2)(c).

161. The vice president of student affairs or his designee did not grant an extension of time for the investigation to the Program or student conduct and community standards as required by Code 3359-41-01(E)(2)(c).

162. Code 3359-41-01(E)(2)(d)-(h) provides:

(d) Upon completion of the investigation, the fact-finding process shall be concluded if both of the following conditions are satisfied:

(i) The student or authorized representative of the student organization denies the alleged misconduct, and

(ii) Based on the information gathered, the student conduct administrator determines that no university rule or regulation was violated.
If these conditions are satisfied, the student or authorized representative of the student organization shall be informed that the matter is closed with no prejudice to him or her.

(e) If the investigation reveals that there is sufficient information to support an allegation that the student or the student organization has violated university rules, the department of student conduct and community standards may place a disciplinary hold on the student's or the student organization's account and may refer the matter to the university

hearing board for further proceedings.

(f) If the student or authorized representative of the student organization admits responsibility for violating university rules, the investigating officer shall issue a sanction or sanctions. If the student or authorized representative of the student organization disagrees with the sanction(s) assigned, s/he may appeal the sanction(s) to the university appeals board.

(g) If the student or authorized representative of the student organization does not agree with the charge(s), and if the investigating officer determines that the charge(s) are appropriate based upon the information collected, the student or authorized representative of the student organization may choose to pursue a determination of responsibility before a student conduct administrator or a university hearing board. An explanation of the charges and the process shall be given to the accused student and all information revealed by the investigation and known to the department of student conduct and community standards shall be included in a comprehensive, detailed, written report by the investigating officer and made available to the accused student or authorized representative of the student organization.

(h) If the matter is referred to a university hearing board, the student or authorized representative of the student organization shall be informed that the university hearing board generally will meet no later than ten business days from the date of the hearing board charge letter. When necessary, the university may continue the date of the hearing beyond ten business days with the approval of the vice president for student affairs or his or her designee.

163. The Program failed to follow the above-listed procedures for referring Ms. Merlitti's case to a university hearing board as required pursuant to Code 3359-41-01(E)(2)(d)-(h).

164. Code 3359-41-01(E)(2)(j) provides, in relevant part:

The student . . . shall be informed in writing by the department of student conduct and community standards of the time and place of the hearing, the specific university rule(s) or regulation(s) that the student is accused of violating, and information on the hearing procedures and the general facts surrounding the incident that led to the charge(s)

165. Neither the Program nor the department of student conduct and community standards gave Ms. Merlitti written notice of the specific university rules or regulations that she was accused of violating as required pursuant to Code 3359-41-01(E)(2)(j).

22

166.   Neither the Program nor the department of student conduct and community standards gave Ms. Merlitti written notice of information on the hearing procedures as required pursuant to Code 3359-41-01(E)(2)(j).

167.   Neither the Program nor the department of student conduct and community standards gave Ms. Merlitti written notice of the general facts surrounding the incident that led to the charges as required pursuant to Code 3359-41-01(E)(2)(j).

168.   The Program failed to provide Ms. Merlitti with any notice or records of any kind prior to the December 8, 2015 hearing in violation of Code 3359-41-01(E)(2)(j).

169.   During the December 18, 2015 hearing, Ms. Merlitti requested a copy of the Report for Student Hearing.  The Program denied her request in violation of Code 3359-41-01(E)(2)(j).

170.   The Program did not provide Ms. Merlitti with a copy of Report for Student Hearing until February 23, 2017 in violation of Code 3359-41-01(E)(2)(j).

171.   Code 3359-41-01(F)(1) provides, in relevant part: "Alleged violations of the code of student conduct shall be heard by a student conduct administrator or university hearing board. In every instance, proper procedural safeguards shall be observed to protect each party's rights.

172.   Ms. Merlitti's case was not heard by a student conduct administrator or university hearing board in violation of Code 3359-41-01(F)(1).

173.   Code 3359-41-01(F)(2)(c) provides, in relevant part: "[T]he following procedural rights shall pertain to all formal proceedings: . . . Sanctions should be commensurate with the violation(s) found to have occurred."

174.   Even if Ms. Merlitti had committed all of the alleged ethical misconduct (and she did not), then dismissal from the Program was an extremely harsh sanction and not at all commensurate with the alleged ethical misconduct in violation of Code 3359-41-01(F)(2)(c).

175.   Code 3359-41-01(F)(2)(e) provides:

Pending action on the alleged violation(s), the status of the student shall not be altered or his or her right to be present on campus and to attend classes suspended, except when the student's continued presence disrupts the good order and discipline of the university or poses a threat to his or her own physical or emotional safety or to that of others. The president or his or her designee shall determine whether such a threat exists. If the president or his or her designee, concludes that such a disruption or threat exists, s/he may suspend the student immediately

23

176.   On or about November 5, 2015, Ms. Merlitti reported the McDonald's meeting to Dr. Patton.

177.   On or about November 6, 2015, Dr. Patton ordered Ms. Merlitti not to return to class.

178.   There was no evidence that Ms. Merlitti's presence in class would have disrupted the good order and discipline of the university.

179.   There was no evidence that Ms. Merlitti presence in class was a threat to the physical or emotional safety of herself or others.

180.   The president or his designee never made a determination that Ms. Merlitti presence in class was a threat to the physical or emotional safety of herself or others.

181.   Dr. Patton's barring Ms. Merlitti from attending classes violated Code 3359-41-01(F)(2)(e).

182.   Code 3359-41-01(F)(2(f) provides, in relevant part:

Prior to a conduct hearing, a representative of the department of student conduct and community standards shall inform the student in writing of the reasons for the proposed disciplinary action. The department of student conduct and community standards will make available to the charged student copies of all information related to the conduct hearing that is in its possession at the time of the notice.

183.   Neither the Program nor the department of student conduct and community standards informed Ms. Merlitti in writing of the reasons for the proposed disciplinary action in violation of Code 3359-41-01(F)(2(f).

184.   During the December 18, 2015 hearing, Ms. Merlitti d a copy of the Report for Student Hearing.  The Program denied her request in violation of Code 3359-41-01(F)(2(f).

185.   The Program did not provide Ms. Merlitti with a copy of Report for Student Hearing until February 23, 2017 in violation of Code 3359-41-01(F)(2(f).

186.   Code 3359-41-01(F)(2(g) provides, in relevant part: "The complainant and the accused student shall have the right to have an advisor of his or her choice present to provide advice and counsel in the hearing and in any meetings with representatives of the department of student conduct and community standards."

187.   At the December 18, 2015 hearing, the Program allowed only Ms. Merlitti's husband to accompany her in violation of Code 3359-41-01(F)(2(g).

24

188. At the December 18, 2015 hearing, the Program forbade Ms. Merlitti's husband to talk to Ms. Merlitti or to serve as her advisor in violation of Code 3359-41-01(F)(2(g).

189. Code 3359-41-01(G)(1)(a)(i) provides:

(G) University hearing board.

(1) Pool of members. The president shall appoint a pool of hearing board members from a list of nominees submitted by the senior vice president, provost and chief operating officer. This pool shall be collected as follows:

(a) Nominees.

(i) Faculty members. Every other year, the dean of each academic college shall nominate, for a two-year renewable term, a minimum of one interested full-time faculty member from his or her college and forward the nominee(s)' name(s) to the director of the department of student conduct and community standards. The director of the department of student conduct and community standards shall compile the list of all interested nominees and forward it, along with his or her recommendations to serve, to the senior vice president, provost and chief operating officer. The senior vice president, provost and chief operating officer will review these nominees and recommendations and forward to the vice president for student affairs his or her recommendations for hearing board membership

190. None of the five Program faculty members who presided over Ms. Merlitti's December 18, 2015 hearing (Drs. Boyle, Jordan, Katafiasz, Patton, and Tefteller) were duly appointed or authorized to so serve pursuant to Code 3359-41-01(G)(1)(a)(i).

191. Code 3359-41-01(G)(2)(a)-(b) provides: "Composition of the boards. The university hearing board shall be composed of five members as follows: (a) Three faculty members or contract professionals; and, (b) Two student members."

192. There were no students on Ms. Merlitti's hearing board in violation of Code 3359-41-01(G)(2)(a)-(b).

193. Code 3359-41-01(G)(2)(e) provides: "In the case of a graduate or professional student accused of misconduct, the student members of the hearing board will be graduate or professional students."

194. Ms. Merlitti was a graduate student.

195.    There were no graduate students on her hearing board in violation of Code 3359-41-01(G)(2)(e).

196.    Code 3359-41-01(G)(2)(f) provides: "The chairperson for the hearing board shall be appointed by the vice president for student affairs upon recommendation by the director of the department of student conduct and community standards from among the board members."

197.    Dr. Jordan served as chairperson of the December 18, 2015 hearing.

198.    Dr. Jordan was not appointed to serve as chairperson by the vice president for student affairs upon recommendation by the director of the department of student conduct and community standards from among the board members in violation of Code 3359-41-01(G)(2)(f).

199.    Code 3359-41-01(G)(2)(g) provides, in relevant part: "The accused student shall have the right to challenge any member of the university hearing board, for good cause."

200.    Ms. Merlitti was not afforded the right to challenge any member of the university hearing board, for good cause December 18, 2015 hearing in violation of Code 3359-41-01(G)(2)(g).

201.    Code 3359-41-01(G)(3) provides:

Training. All hearing board members shall be trained by the department of student conduct and community standards on core competencies needed to perform their duties, including but not limited to hearing board procedure, evaluating information, techniques for questioning witnesses, applying the standard of proof, sanctioning, and issues of diversity. All members who complete training shall be eligible to serve on the university hearing board if needed. Chairpersons will receive further training from the department of student conduct and community standards

202.    None of the five Program faculty members who presided over Ms. Merlitti's December 18, 2015 hearing (Drs. Boyle, Jordan, Katafiasz, Patton, and Tefteller) completed the training required pursuant to Code 3359-41-01(G)(3).

203.    Code 3359-41-01(G)(4)(a) provides:

The department of student conduct and community standards shall notify the student in writing of the time and place of the hearing, the specific university rule(s) or regulation(s) that the student is charged with violating, information on the hearing procedures and the facts surrounding the incident that led to the charges.

204.    Neither the Program nor the department of student conduct and community standards gave Ms. Merlitti written notice of the specific university rules or regulations that she was accused of violating as required pursuant to Code 3359-41-01(G)(4)(a).

205.    Neither the Program nor the department of student conduct and community standards gave Ms. Merlitti written notice of information on the hearing procedures as required pursuant to Code 3359-41-01(G)(4)(a).

206.    Neither the Program nor the department of student conduct and community standards gave Ms. Merlitti written notice of the general facts surrounding the incident that led to the charges as required pursuant to Code 3359-41-01(G)(4)(a).

207.    The Program failed to provide Ms. Merlitti with any notice or records of any kind in violation of Code 3359-41-01(G)(4)(a).

208.    During the December 18, 2015 hearing, Ms. Merlitti requested a copy of the Report for Student Hearing.  The Program denied her request in violation of Code 3359-41-01(G)(4)(a).

209.    The Program did not provide Ms. Merlitti with a copy of Report for Student Hearing until February 23, 2017 in violation of Code 3359-41-01(G)(4)(a).

210.    Code 3359-41-01(G)(4)(d) provides: "The student has the right to have his or her responsibility or lack of responsibility determined by the university hearing board."

211.    Ms. Merlitti was denied a properly constituted university hearing board in violation of Code 3359-41-01(G)(4)(d).

212.    Code 3359-41-01(G)(4)(d)(i) provides:

No member of the university hearing board shall be a party to prior investigation of the alleged violation against the student, nor should any member of the university hearing board be placed in a position of developing or presenting the information related to the charges. If any member is unavoidably involved, s/he must disclose and shall not participate in the proceedings as a member of the hearing board.

213.    Drs. Boyle, Jordan, Katafiasz, and Patton served on the panel of five Program faculty members that heard Ms. Merlitti's case.

214.    Drs. Boyle, Jordan, Katafiasz, and Patton also investigated the allegations against Ms. Merlitti.

215.   Drs. Boyle, Jordan, Katafiasz, and Patton developed and presented information to the panel related to the allegations against Ms. Merlitti.

216.   Drs. Boyle, Jordan, Katafiasz, and Patton failed to disclose their conflicts of interest.

217.   By simultaneously serving as panel members, investigators, and presenters, Drs. Boyle, Jordan, Katafiasz, and Patton violated Code 3359-41-01(G)(4)(d)(i).

218.   Code 3359-41-01(G)(4)(d)(ii) provides:

       The student conduct administrator shall begin the hearing by reviewing the hearing board procedures that include the standard of evidence needed to support the finding of responsibility and a summary of the hearing procedure. The student conduct administrator also shall be responsible for recording the hearing.

219.   No one from the Program reviewed the procedures and standard of evidence at the December 18, 2015 hearing in violation of Code 3359-41-01(G)(4)(d)(ii).

220.   No one from the Program recorded the December 18, 2015 hearing in violation of Code 3359-41-01(G)(4)(d)(ii).

221.   Code 3359-41-01(G)(4)(d)(iii) provides: "The chairperson of the board shall advise the student of the alleged violation(s) by reading the notice of hearing and shall inform the student that s/he may admit responsibility, deny responsibility or partly admit and partly deny responsibility."

222.   Dr. Jordan served as chairperson of the December 18, 2015 hearing.

223.   Dr. Jordan failed to advise Ms. Merlitti of the alleged violations by reading the notice of hearing in violation of Code 3359-41-01(G)(4)(d)(iii).

224.   Dr. Jordan failed to inform Ms. Merlitti that se may admit responsibility, deny responsibility or partly admit and partly deny responsibility in violation of Code 3359-41-01(G)(4)(d)(iii).

225.   Code 3359-41-01(G)(4)(d)(v)(a)-(c) provides:

       (v) A denial or partial denial of responsibility by the accused student shall require the complainant to present information to support the charges(s).

       (a) Information related to the charge(s) shall be presented by the complainant and/or a representative of the department of student conduct and community standards.

(b) Such information may consist of **oral testimony** and the introduction of any **physical exhibits** that pertain to the charge(s).

(c) The complainant and the accused student shall be given an opportunity to **hear and question all witnesses**, as well as to **present information and call witnesses**.  (emphasis added)

226.   Ms. Merlitti was denied the right and opportunity to call witnesses on her behalf at the December 18, 2015 hearing in violation of Code 3359-41-01(G)(4)(d)(v)(a)-(c).

227.   Ms. Merlitti was denied the right and opportunity to present exhibits and information on her behalf at the December 18, 2015 hearing in violation of Code 3359-41-01(G)(4)(d)(v)(a)-(c).

228.   Code 3359-41-01(G)(4)(d)(v)(g) provides: "The standard of proof that shall apply to all hearings is 'preponderance of the evidence', (i.e., more likely than not), that the alleged conduct occurred."

229.   The Program and the University of Akron failed to satisfy the evidentiary burden pursuant to Code 3359-41-01(G)(4)(d)(v)(g).   Indeed, the Board completely exonerated Ms. Merlitti of any alleged ethical violations.

230.   Code 3359-41-01(G)(4)(g) provides:

The report of the university hearing board shall consist of a simple statement covering the chronological sequence of the hearing procedure, together with a summary of evidence presented to the university hearing board, the conclusions reached by it on the basis of such evidence, its conclusion as to the finding of responsibility and, if applicable, sanction(s). The report shall be signed by all members of the university hearing board and shall be final, subject only to the student's right of appeal to the university appeals board and to the limited right for presidential review pursuant to section (I).

231.   The Program failed to prepare a report pursuant to Code 3359-41-01(G)(4)(g).

232.   Code 3359-41-01(G)(4)(h) provides: "The representative of the department of student conduct and community standards shall transmit the report of the university hearing board in writing to the student."

233.   Neither the Program nor a representative of the department of student conduct and community standards transmitted a written hearing report to Ms. Merlitti within the meaning of this rule in violation of Code 3359-41-01(G)(4)(h).

234. Code 3359-41-01(H)(1)(a) provides, in relevant part: "University appeals board. Composition. The university appeals board shall be composed of three members including one student and at least one faculty member . . . ."

235. The University of Akron failed to convene a duly constituted appeals board to review Ms. Merlitti's case in violation of Code 3359-41-01(H)(1)(a).

236. Code 3359-41-01(H)(2)(a) provides:

(2) Procedures.

(a) The complainant or adjudicated student ("the appellant(s)") shall have five business days from the time that s/he is notified of the outcome of the hearing in which to petition the appeals board in writing for a review. In order to prepare for the appeal the appellant(s) may have access to materials that shall be provided to the appeals board, including a complete record of the hearing.

237. The Program failed to provide Ms. Merlitti with a complete record of the hearing in violation of Code 3359-41-01(H)(2)(a).

238. Code 3359-41-01(E)(1) provides, in relevant part: "It is the intent of this provision that the department of student conduct and community standards shall be the **exclusive administrative unit** that has authority **to investigate** reports of [academic] misconduct as defined in this rule and **to implement the procedures and sanctions** as provided in this rule." (emphasis added)

239. Code 3359-41-01(E)(1) also provides, in relevant part:

While other units and organizations such as residence halls, athletic teams and **professional schools** may have separate rules and administer separate penalties or sanctions, whether by contract or otherwise, that may apply to certain categories of students, **the commission of [academic] misconduct as defined in this rule shall also be reported to the department of student conduct and community standards** for action as appropriate under this rule. (emphasis added).

240. As discussed below, the Program has "separate rules" and, therefore, may "administer separate penalties or sanctions."

241. Nevertheless, pursuant to Code 3359-41-01(E)(1), the University of Akron was contractually obligated to adjudicate the Program's allegations of ethical violations against Ms. Merlitti pursuant to the Code.

**Marriage and Family Therapy/Counseling Program Masters Handbook**

242.    As a matter of law, Ms. Merlitti and the University of Akron had a contractual relationship.   The terms of this contract include, *inter alia*, the Marriage and Family Therapy/Counseling Program Masters Handbook ("Handbook").

243.    The Handbook sets forth the Program's disciplinary procedures as follows:

> Students will be informed by the Chair of the Department of Counseling of any review procedures (academic or personal fitness) that might impact their ability to continue in the program.  In the event a student concern is raised that might result in dismissal from the Program the student will be notified of the reason for review, the time and the date of the MFC/T review meeting.  The student may either present in writing or appear before the MFC/T faculty to present their position. The MFC/T Program will discuss and vote on all recommendations for serious academic or personal fitness concern issues.  Students will be notified in writing of the recommendations.  Students have the right to appeal any decision made by the MFC/T Program to the Chair of the Department, as the first step in the due process procedure.  The student will appeal, in writing, any actions taken first to the Department Chair for resolution, then the Dean of the College for resolution, and then to the Graduate School Dean for further action if appropriate.

244.    The Program has never notified Ms. Merlitti in writing of its recommendations in accordance with the disciplinary procedures outlined in the Handbook.

245.    Ms. Merlitti timely appealed the Program's decision to dismiss her from the Program to the then-Chair of the Department (Dr. Jordan).

246.    Dr. Jordan told Ms. Merlitti to "stand by" because the Program "was still gathering information."

247.    Ms. Merlitti next timely appealed to the then-Dean of the College (Dr. Gordon).

248.    Dr. Gordon referred Ms. Merlitti back to Dr. Jordan and took no further action.

**CACREP Accreditation Standards**

249.    As a matter of law, Ms. Merlitti and the University of Akron had a contractual relationship.   The terms of this contract include, *inter alia*, the accreditation standards of the Council for Accreditation of Counseling & Related Educational Programs ("CACREP") (Exhibit Q).  *See Behrend v. State*, 55 Ohio App.2d 135, 139, 140, 379 N.E.2d 617 (10th Dist. 1977); *Al Dabagh*, *supra*, at 359.

250.    At the relevant time, the Program was CACREP accredited.

31

251.   CACREP accreditation standards require, *inter alia*:

 [(1)] Counselor education program faculty must annually post on the program's website in an easily accessible location the following specific information for each entry-level specialty area and doctoral program: (1) the number of graduates for the past academic year, (2) pass rates on credentialing examinations, (3) completion rates, and (4) job placement rates. . . .

[(2)] The counselor education program faculty has a systematic process in place for the use of individual student assessment data in relation to retention, remediation, and dismissal. . . .

[(3)] Students have regular, systematic opportunities to formally evaluate practicum and internship supervisors. . . .

[(4)] Counselor education programs with a specialty area in marriage, couple, and family counseling must document where each of the lettered standards listed below is covered in the curriculum. . . . p. record keeping, third party reimbursement, and other practice and management consideration in marriage, couple, and family counseling.

2016 CACREP Standards p. 18, 19, 31-32.

252.   The Program failed to satisfy these above-listed CACREP accreditation standards.

**COAMFTE Accreditation Standards**

253.   As a matter of law, Ms. Merlitti and the University of Akron had a contractual relationship.   The terms of this contract include, *inter alia*, the accreditation standards of the Commission on Accreditation for Marriage and Family Therapy Education ("COAMFTE") (Exhibit R).   *See Behrend v. State*, 55 Ohio App.2d 135, 139, 140, 379 N.E.2d 617 (10th Dist. 1977); *Al Dabagh*, *supra*, at 359.

254.   At the relevant time, the Program was COAMFTE accredited.

255.   COAMFTE accreditation standards require, *inter alia*:

[(1)] Published and accessible policies include but are not limited to policies on recruitment, admission, retention, complaints and grievances, remediation and dismissal, grading/assessment, and anti-discrimination. Programs with codes of conduct  must publish these along with published disciplinary processes. . . .

[(2)] Eligibility Criterion I: Student Concerns, Complaints, and Grievances[.]   The program provides evidence of addressing students concerns, complaints, and grievances.

32

The program has published formal and informal processes for addressing student concerns.

The program demonstrates it complies with its published policies regarding concerns, complaints, and grievances within the program (and institutionally, if applicable).  The program maintains a written record of all formal student complaints and grievances, including written complaints or grievances, program action, and resolution.

The program uses data regarding concerns, complaints, and grievances to foster program improvement when appropriate. . . .

[(3)] The program demonstrates a climate of safety, respect, and appreciation for all learners including those from diverse, marginalized, and/or underserved communities and has mechanisms in place for evaluating the climate and responding to any feedback regarding the climate. . . .

[(4)] The program demonstrates that academic resources (e.g., library, advising, writing centers) and student support services (e.g., access to counseling, financial advising) are accessible to students and sufficient to achieve the program's mission, goals, and outcomes.  These resources are reviewed based on core faculty and student input, and the program takes action or advocates for institutional change to address areas required for program effectiveness. . . .

[(5)] The program must describe decision-making processes and procedures at the program and institutional levels regarding the operation of the program that supports program effectiveness. . . .

[(6)] Programs have agreements with practice sites that outline the institutions', the practice sites' and the students' responsibilities, and publish procedures in place for managing any difficulties with sites, supervisors, or students. . . .

[(7)] The program must demonstrate appropriate and adequate mentoring of students during the experience.

COAMFTE Accreditation Standards Graduate & Post-Graduate Marriage and Family Therapy Training Programs Version 12.0 p. 14, 16, 20, 23, 25, 34.

256.    The Program failed to satisfy these above-listed COAMFTE accreditation standards.

**FIRST CLAIM:**
**BREACH OF CONTRACT**
**FAILURE TO FOLLOW CODE OF STUDENT CONDUCT**

257.    Plaintiff incorporates all preceding paragraphs of this Complaint herein.

258.    The plaintiff and the defendants entered into a binding contract supported by consideration.

259.    The terms of this contract include, *inter alia*, the Code of Student Conduct of the University of Akron.

260.    Plaintiff has at all times performed her obligations under the contract.

261.    As described in ¶¶ 137 through 241 above, the defendants have breached this contract by failing to adjudicate the allegations of academic misconduct against the plaintiff in accordance with the procedural and substantive provisions of the Code of Student Conduct of the University of Akron.

262.    As a result of the defendants' breach of contract, plaintiff has been damaged in the amount of at least $80,800.

**SECOND CLAIM:**
**BREACH OF CONTRACT**
**FAILURE TO FOLLOW MARRIAGE AND FAMILY THERAPY/COUNSELING PROGRAM MASTERS HANDBOOK**

263.    Plaintiff incorporates all preceding paragraphs of this Complaint herein.

264.    The plaintiff and the defendants entered into a binding contract supported by consideration.

265.    The terms of this contract include, *inter alia*, the Marriage and Family Therapy/Counseling Program Masters Handbook.

266.    Plaintiff has at all times performed her obligations under the contract.

267.    As described in ¶¶ 242 through 248 above, the defendants have breached this contract by failing to adjudicate the allegations of academic misconduct against the plaintiff in accordance with the procedural and substantive provisions of the Marriage and Family Therapy/Counseling Program Masters Handbook.

268.    As a result of the defendants' breach of contract, plaintiff has been damaged in the amount of at least $80,800.

**THIRD CLAIM:**
**BREACH OF CONTRACT**
**FAILURE TO ADHERE TO CACREP ACCREDITATION STANDARDS**

269.   Plaintiff incorporates all preceding paragraphs of this Complaint herein.

270.   The plaintiff and the defendants entered into a binding contract supported by consideration.

271.   The terms of this contract include, *inter alia*, the accreditation standards of the Council for Accreditation of Counseling & Related Educational Programs.

272.   Plaintiff has at all times performed her obligations under the contract.

273.   As described in ¶¶ 249 through 252 above, the defendants have breached this contract by failing to satisfy and adhere to the accreditation standards of the Council for Accreditation of Counseling & Related Educational Programs.

274.   As a result of the defendants' breach of contract, plaintiff has been damaged in the amount of at least $80,800.


**FOURTH CLAIM:**
**BREACH OF CONTRACT**
**FAILURE TO ADHERE TO COAMFTE ACCREDITATION STANDARDS**

275.   Plaintiff incorporates all preceding paragraphs of this Complaint herein.

276.   The plaintiff and the defendants entered into a binding contract supported by consideration.

277.   The terms of this contract include, *inter alia*, the accreditation standards of the Commission on Accreditation for Marriage and Family Therapy Education.

278.   Plaintiff has at all times performed her obligations under the contract.

279.   As described in ¶¶ 253 through 256 above, the defendants have breached this contract by failing to satisfy and adhere to the accreditation standards of the Commission on Accreditation for Marriage and Family Therapy Education.

280.   As a result of the defendants' breach of contract, plaintiff has been damaged in the amount of at least $80,800.

## FIFTH CLAIM:
## TORTIOUS INTERFERENCE WITH CONTRACT

281.  Plaintiff incorporates all preceding paragraphs of this Complaint herein.

282.  As described in ¶¶ 39 through 41 above, Family Pride was so favorably impressed with Ms. Merlitti's practicum work that Ms. Daugherty (Family Pride's executive director), on behalf of Family Pride, offered Ms. Merlitti a full-time, marriage and family therapist job.

283.  Plaintiff accepted Family Pride's job offer.

284.  Family Pride and Ms. Merlitti agreed upon employment terms, salary terms, and a start date.

285.  An employment contract existed between plaintiff and defendant Family Pride.

286.  Defendants Family Pride, Ms. Daugherty, Ms. Spellman, and Dr. Patton each had personal knowledge of the employment contract between Family Pride and Ms. Merlitti.

287.  On or about November 9, 2015, Dr. Patton met with Ms. Merlitti's Family Pride supervisors, including Ms. Spellman.

288.  During this meeting, defendants the University of Akron, Family Pride, Ms. Daugherty, Ms. Spellman, and Dr. Patton intentionally procured Family Pride's breach of the employment contract between Family Pride and Ms. Merlitti.

289.  Defendants University of Akron, Family Pride, Ms. Daugherty, Ms. Spellman, and Dr. Patton had no legal justification for intentionally procuring Family Pride's breach of the employment contract between Family Pride and Ms. Merlitti.

290.  As a result of defendants University of Akron, Family Pride, Ms. Daugherty, Ms. Spellman, and Dr. Patton's tortious interference with the employment contract between Family Pride and Ms. Merlitti, plaintiff has been damaged in the amount of at least $76,000.

## SIXTH CLAIM:
## INTENTIONAL INFLICTION OF SERIOUS EMOTIONAL DISTRESS

291.    Plaintiff incorporates all preceding paragraphs of this Complaint herein.

292.    On or about October 19–23, 2015, Ms. Spellman (Ms. Merlitti's practicum supervisor at Family Pride) ordered Ms. Merlitti to meet with her at a local McDonald's restaurant to discuss practicum matters.

293.    On or about November 5, 2015, Ms. Merlitti reported this McDonald's meeting to Dr. Patton.

294.    On or about November 5, 2015, Dr. Patton told Ms. Merlitti that this meeting at McDonald's was "unethical."

295.    On or about November 5, 2015, and without any due process or legal justification, Dr. Patton ordered Ms. Merlitti not to return to class.

296.    On or about November 6, 2015, because of the psychological trauma resulting from the false accusation of unethical behavior and being ordered not to return to class, Ms. Merlitti suffered an acute psychotic episode marked by extreme paranoia.

297.    Due to the psychological trauma resulting from the false accusation of unethical behavior and being ordered not to return to class, Ms. Merlitti was hospitalized as an in-patient for psychiatric treatment until November 9, 2015.

298.    Ms. Merlitti continues to receive mental health services for the psychological trauma that she suffered resulting from the false accusation of unethical behavior and being ordered not to return to class.

299.    Dr. Patton's actions (*i.e.*, falsely accusing Ms. Merlitti of engaging in unethical conduct and ordering Ms. Merlitti not to return to class without any due process or legal justification) were extreme, outrageous, intentional and/or reckless.

300.    Dr. Patton's extreme, outrageous, intentional and/or reckless actions (*i.e.*, falsely accusing Ms. Merlitti of engaging in unethical conduct and ordering Ms. Merlitti not to return to class without any due process or legal justification), caused Ms. Merlitti to suffer—and continue to suffer—severe emotional distress.

301.    As a direct and proximate result of the severe emotional distress that Ms. Merlitti suffered—and continues to suffer—as a result of Dr. Patton's extreme, outrageous, intentional and/or reckless actions (*i.e.*, falsely accusing Ms. Merlitti of engaging in unethical conduct and ordering Ms. Merlitti not to return to class without any due process or legal justification), Ms. Merlitti was hospitalized as an

in-patient for psychiatric treatment from November 6, 2015 until November 9, 2015.

302. As a direct and proximate result of the severe emotional distress that Ms. Merlitti suffered—and continues to suffer—as a result of Dr. Patton's extreme, outrageous, intentional and/or reckless actions (*i.e.*, falsely accusing Ms. Merlitti of engaging in unethical conduct and ordering Ms. Merlitti not to return to class without any due process or legal justification), Ms. Merlitti continues to receive mental health services.

303. As a direct and proximate result of the severe emotional distress that Ms. Merlitti suffered—and continues to suffer—as a result of Dr. Patton's extreme, outrageous, intentional and/or reckless actions (*i.e.*, falsely accusing Ms. Merlitti of engaging in unethical conduct and ordering Ms. Merlitti not to return to class without any due process or legal justification), plaintiff has been damaged in the amount of at least $1,000,000.

## SEVENTH CLAIM:
## DEFAMATION

304. Plaintiff incorporates all preceding paragraphs of this Complaint herein.

305. On or about April 17, 2017, Dr. Ramsier wrote a letter to Ms. Merlitti and others which provides, in relevant part: "[Y]ou [(*i.e.*, Ms. Merlitti)] did not provide sufficient evidence of understanding professional ethics."

306. On or about June 16, 2017, Mr. Stasitis wrote a letter which provides, in relevant part: "In [Ms. Merlitti]'s case, she was dismissed from an academic program as a result of concerns dealing with her ethical behavior . . . The basis for the prior dismissal was a result of multiple ethical violations."

307. On or about November 17, 2017, Mr. Stasitis wrote a letter which provides, in relevant part: "Ms. Merlitti signed a Memorandum of Agreement with each of her internship locations attesting to have read and understood the ACA and AAMFT ethical standards and that she would abide by those standards. . . . Ms. Merlitti breached the agreements she signed with each site."

308. The statements in ¶¶ 305 through 307 are false.

309. The statements in ¶¶ 305 through 307 are about the plaintiff.

310. The statements in ¶¶ 305 through 307 were published without privilege to one or more third parties.

311.   The defendants published the defamatory statements in ¶¶ 305 through 307 with fault, negligence, or both because the plaintiff has never shown evidence of insufficient understanding of professional ethics and/or engaged in any unethical conduct with respect to the marriage and family therapy profession.

312.   The statements in ¶¶ 305 through 307 are defamation *per se* because, on their face, they reflect upon the plaintiff's character in a manner that will injure the plaintiff in her profession as a marriage and family therapist.

313.   As a result of the defendants' defamation, plaintiff has been damaged in the amount of at least $1,000,000.

**EIGHTH CLAIM:**
**WRONGFUL DISCLOSURE (R.C. §1347.10)**

314.   Plaintiff incorporates all preceding paragraphs of this Complaint herein.

315.   The defendants repeatedly and consistently assert that Ms. Merlitti committed several ethical violations of the marriage and family therapy profession.  This is not true.

316.   The defendants repeatedly and consistently assert that Ms. Merlitti's marriage and family therapy diagnostic skills are substandard.  This is not true.

317.   Based upon ¶¶ 315 and 316, the University of Akron is intentionally maintaining personal information that it knows, or has reason to know, is inaccurate, irrelevant, no longer timely, or incomplete and may result in such harm to the plaintiff in violation of R.C. §1347.10(A)(1).

318.   Based upon ¶¶ 315 and 316, the University of Akron is intentionally supplying personal information for storage in, or using or disclosing personal information maintained in, a personal information system, that it knows, or has reason to know, is false in violation of R.C. §1347.10(A)(3).

319.   Based upon ¶¶ 315 and 316, the University of Akron is intentionally denying to Ms. Merlitti the right to inspect and dispute the personal information at a time when inspection or correction might have prevented the harm to the plaintiff in violation of R.C. §1347.10(A)(4).

320.   Pursuant to R.C. §1347.10(B), the plaintiff is entitled to a court order enjoining the University of Akron from continuing to violate R.C. §1347.10(A). Specifically, the defendants should be enjoined from asserting that Ms. Merlitti committed several ethical violations of the marriage and family therapy profession and/or that Ms. Merlitti's marriage and family therapy diagnostic skills are substandard.

**NINTH CLAIM:**
**42 U.S.C. §1983**
**FIRST AMENDMENT PETITION CLAUSE**

321.   Plaintiff incorporates all preceding paragraphs of this Complaint herein.

322.   On or about July 13, 2017, Dr. Ramsier wrote an email to Ms. Merlitti which provides, in relevant part: "Please cease communications on this matter with other offices at The University of Akron.  Our employees have the needs of current students to attend to."

323.   Dr. Ramsier wrote this email in his capacity as the University of Akron's Senior Vice President and Provost and, therefore, was acting under color of state law as an agent of a public university.

324.   Dr. Ramsier is a natural person.

325.   The Petition Clause of the First Amendment to the Constitution of the United States provides: "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the government for a redress of grievances."

326.   Dr. Ramsier's July 13, 2017 statement to Ms. Merlitti ordering her to cease communications with the University of Akron (except for the Provost's Office) violated Ms. Merlitti's First Amendment right to petition the University of Akron (a public university) for redress of her grievances.

327.   Dr. Ramsier's July 13, 2017 statement to Ms. Merlitti deprived Ms. Merlitti of rights, privileges, and immunities secured by the Constitution and laws of the United States.

328.   As a result of the defendants' violation of the plaintiff's civil right to petition the government for a redress of grievances, plaintiff has been damaged in the amount of at least $1,000,000.


**TENTH CLAIM:**
**42 U.S.C. §1983**
**FIRST AMENDMENT FREEDOM OF ASSEMBLY CLAUSE**

329.   Plaintiff incorporates all preceding paragraphs of this Complaint herein.

330.   On or about November 5, 2015, Dr. Patton ordered Ms. Merlitti not to return to class at the University of Akron.

331.   Dr. Patton ordered Ms. Merlitti not to return to class in her capacity as a professor in the University of Akron's Counseling Department and an agent of the

University of Akron and, therefore, was acting under color of state law as an agent of a public university.

332.    Dr. Patton is a natural person.

333.    The Freedom of Assembly Clause of the First Amendment to the Constitution of the United States provides: "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble."

334.    Dr. Patton's November 5, 2015 order to Ms. Merlitti not to attend classes at the University of Akron (a public university) violated Ms. Merlitti's First Amendment right to peaceably assemble.

335.    Dr. Patton's November 5, 2015 order to Ms. Merlitti not to attend classes at the University of Akron (a public university) deprived Ms. Merlitti of rights, privileges, and immunities secured by the Constitution and laws of the United States.

336.    As a result of the defendants' violation of the plaintiff's civil right to peaceably assemble, plaintiff has been damaged in the amount of at least $1,000,000.

* * *

Wherefore, plaintiff prays that this court enter judgment in her favor on her claims jointly and severally against each of the defendants and award her the following recovery:

(i)     $80,800 on the first claim;

(ii)    $80,800 on the second claim;

(iii)   $80,800 on the third claim;

(iv)    $80,800 on the fourth claim;

(v)     $76,000 on the fifth claim;

(vi)    $1,000,000 on the sixth claim;

(vii)   $1,000,000 on the seventh claim;

(viii)  Injunctive relief on the eighth claim;

(ix)    $1,000,000 on the ninth claim;

(x)     $1,000,000 on the tenth claim;

41

(xi)    An order from this court directing the University of Akron to immediately award Ms. Merlitti a Master's Degree in Marriage and Family Therapy retroactively dated to December 2015;

(xii)   Punitive and exemplary damages, to punish and make an example of the defendants, and to deter future, similar conduct by them and others;

(xiii)  All fines, penalties, and other assessments allowed by law;

(xiv)   Attorneys' fees; and

(xv)    Any other relief deemed appropriate by this Court.

> Respectfully submitted,
>
> /s/ *David V. Patton*
> David V. Patton (70930)
> The Patton Law Firm, LLC
> 33595 Bainbridge Road, Suite 200A
> Solon, OH  44139-2981
>
> (440) 248-1078 (telephone)
> (440) 201-6465 (facsimile)
> dpatton@lawpatton.com (e-mail)
> www.lawpatton.com (website)
>
> Attorney for plaintiff

## JURY DEMAND

Plaintiff, Tonya Merlitti, hereby demands a jury trial on all issues in this action.

/s/ *David V. Patton*
David V. Patton (70930)

Attorney for plaintiff

## CERTIFICATE OF SERVICE

A copy of the foregoing Complaint was sent via regular U.S. Mail, postage prepaid,

on February 1, 2018, to the following:

University of Akron
302 Buchtel Commons
Akron, OH, 44325

Mike DeWine
Ohio Attorney General
30 East Broad Street, 14th Floor
Columbus, OH, 43215

Greenleaf Family Center
c/o Dawn Glenny (statutory agent)
580 Grant Street
Akron, OH, 44311

Angela M. Richmond-Rossiter, LPCC
Greenleaf Family Center
580 Grant Street
Akron, OH, 44311

Alise G. Bartley, Ph.D.
The Relationship Center
7023 Mears Gate Drive, NW, Suite A
North Canton, OH, 44720

John L. Balash, III, LPCC
246 Northland Drive, Suite 200A
Medina, OH, 44256

Karin B. Jordan, Ph.D.
The University of Akron
Counseling Department
Akron, OH, 44325-5007

Family Pride of Northeast Ohio, Inc.
c/o Angela L. Daugherty (statutory agent)
695 South Street, #6
Chardon, OH, 44024

Angela L. Daugherty, LISW
Family Pride of Northeast Ohio, Inc.
695 South Street, #6
Chardon, OH, 44024

Margaret J. Spellman, LPCC
695 South Street, Suite 6
Chardon, OH, 44024

Jennifer S. Emch, M.Ed.
695 South Street, #6
Chardon, OH, 44024

Rikki A. Patton, Ph.D.
The University of Akron
Counseling Department
Akron, OH, 44325-4201

Rebecca A. Boyle, Ph.D.
The University of Akron
Counseling Department
Akron, OH, 44325-5007

Heather Katafiasz, Ph.D.
The University of Akron
Counseling Department
Akron, OH, 44325-5007

David H. Tefteller, Ph.D.
The University of Akron
Counseling Department
Akron, OH, 44325-5007

Rex D. Ramsier, Ph.D.
The University of Akron
Office of Academic Affairs
Akron, OH, 44325-4703

Mark G. Stasitis
The University of Akron
Office of the Vice President and
General Counsel
Akron, OH, 44325-4706

Matthew J. Wilson
The University of Akron
Office of the President
Akron, OH, 44325-4702

David Gordon, M.D.
University of Michigan Pathology
University Hospital Floor 2
1500 East Medical Center Drive
SPC 5054
Ann Arbor, MI, 48109

/s/ *David V. Patton*
David V. Patton (70930)

Attorney for plaintiff

**EXHIBITS**

Exhibit A:      Jordan Notes

Exhibit B:      Internship Clinical Evaluation

Exhibit C:      Text messages from Ms. Emch to Ms. Merlitti

Exhibit D:      Family Pride job offer to Ms. Merlitti

Exhibit E:      Ms. Merlitti's contemporaneous notes showing a planned beginning
                employment date at Family Pride of January 4, 2016

Exhibit F:      Ms. Merlitti's contemporaneous notes memorializing her conversation
                with Family Pride regarding employment

Exhibit G:      Report for Student Hearing

Exhibit H:      AAMFT Letter

Exhibit I:      ACA Email

Exhibit J:      Board Letter

Exhibit K:      Ramsier Letter

Exhibit L:      Unofficial Academic Record

Exhibit M:      Stasitis Letter #1

Exhibit N:      Ramsier Email

Exhibit O:      Stasitis Letter #2

Exhibit P:      Code of Student Conduct of the University of Akron

Exhibit Q:      CACREP accreditation standards

Exhibit R:      COAMFTE accreditation standards